**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TODD STANLEY

     *Plaintiff*,

v.                         CASE NO. 2:13–CV–13540–MOB–PTM

COMMISSIONER OF          DISTRICT JUDGE MARIANNE O. BATTANI
SOCIAL SECURITY,        MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), to review the Commissioner's decision denying

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Plaintiff's claim for Disability Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 8, 12.)

Plaintiff Todd Stanley was forty years old at the time of the most recent administrative hearing on October 4, 2011. (Transcript, Doc. 7 at 56, 143.) Plaintiff worked for almost sixteen years as a paramedic. (Tr. at 159.) Plaintiff filed his disability claim on June 30, 2010, alleging that he became unable to work on October 2, 2009. (Tr. at 143.) The claim was denied at the initial administrative stages. (Tr. at 80-94.) In denying Plaintiff's claim, the Commissioner considered the following illnesses, injuries or conditions: "closed head injury, PTSD, [and] post concussion syndrome." (*Tr.* at 80.) On October 4, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Elliott Bunce, who considered the application for benefits *de novo*. (Tr. at 36-53, 56-77.) In a decision dated January 13, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 36-53.) On February 9, 2012, Plaintiff requested a review of this decision from the Appeals Council. (Tr. at 33-35.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on June 14, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On August 16, 2013, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1 at 1.)

## B.    Standard of Review

Through the Social Security Act and its subsequent amendments, Congress created a statutory right for those who can demonstrate that they are disabled to collect disability benefits. 42 U.S.C. §§ 301-1397. With the Act Congress also established the Social Security

2

Administration and gave it (1) adjudicative power "to administer the old-age, survivors, and disability insurance[,] . . . and the supplemental security income program[s]" under 42 U.S.C. § 901, and (2) rulemaking power, subject to rulemaking procedures, for the Commissioner to "prescribe such rules and regulations" when they are determined to be "necessary or appropriate to carry out the functions of the Administration" under 42 U.S.C. § 902. Therefore, the Social Security Administration ("the Agency") makes factual determinations about whether a person qualifies for disability benefits and also establishes regulations to guide the administration of benefits.

The Agency has promulgated the following rules[2] for the administration of its disability insurance benefits. 20 C.F.R. 401-422. First, a state agency, "acting under the authority and supervision of the Agency," usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503;  *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). If a claimant is denied, he or she may seek review of the state's decision with the Agency's three-stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered *de novo* by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after exhausting the Agency's administrative remedies, that is, after the Commissioner has issued a final administrative decision that is unfavorable, may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

---

[2] The federal judiciary's review of the Agency's promulgated regulations is limited to ensuring the rules do not exceed the authority given to the Agency by Congress and that they are not arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 528 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105.

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review since we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive

2:13-cv-13540-MOB-PTM   Doc # 13   Filed 08/01/14   Pg 5 of 28   Pg ID 683

notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record before the ALJ only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that

either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

### C.   Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

6

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work . . . ." *Jones*, 336 F.3d at 474, *cited with approval in Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her RFC [residual functional

capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20

C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step

one that Plaintiff met the insured status requirements through December 31, 2014 and had not

engaged in substantial gainful activity since October 2, 2009, the alleged onset date. (Tr. at 41.)

At step two, the ALJ found that Plaintiff's post-concussion syndrome, headaches, and

somatoform disorder were "severe" within the meaning of 20 C.F.R. § 404.1520. (*Id.*) At step

three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled

one of the listings in the regulations. (Tr. at 42-43.) At step four, the ALJ found that Plaintiff

was unable to perform any past relevant work. (Tr. at 48.) The ALJ also found that at the

alleged onset Plaintiff fell into the "younger individual," range of 18-49 because he was thirty-

eight years old at the alleged onset date. (Tr. at 48.) At step five, the ALJ found that Plaintiff

could perform light, unskilled work. (*Id.*) Therefore, the ALJ found that Plaintiff was not

disabled. (Tr. at 28-29.)

### E.   Administrative Record

### 1.   Medical History

On October 2, 2009 Plaintiff sustained "blunt head trauma to the right temporal parietal

region," when the EMT van that he was working in as a technician was hit in a motor vehicle

accident. (Tr. at 239, 291-96.) At the time of the collision he was in the passenger seat wearing

his seatbelt. (*Id.*) His "right posterior parietal area impacted upon a coat hook," and, while he

denies losing consciousness, "he was extremely dazed," and his scalp laceration required eight

staples. (Tr. at 239.) No fractures were found on a brain CT or on multiple x-rays and he was discharged the following day. (*Id.*) After the accident Plaintiff was oriented times three, and his vital signs, eyes, heart, respiratory, abdomen, back, skin, and extremities were normal. (Tr. at 291-96.) His head had a "deep 1.5 cm laceration of the right posterior aspect of the vertex." (*Id.*)

At his follow up with Dr. Saddiqui on October 6th, Plaintiff complained of headaches and nausea, his neurological exam was without deficits, and his lumbar spine exam showed normal range of motion. (Tr. at 466.) On October 12, 2009 Plaintiff reported improvement: his headaches were less frequent and his only complaint was nausea, which also seemed to be subsiding. (Tr. at 465.) The wound on his scalp had healed, the staples had been removed, and the neurological exam was normal. (*Id.*)

An October 2, 2009 CT showed "a negative exam for acute intracranial pathology." (Tr. at 251, 299.) An October 23, 2009 CT showed "no evidence of skull fracture, no evidence of intracranial hemorrhage, mass effect, or midline shift," and "[m]inimal mucosal thickening in the sphenoid sinus." (*Id.*) An MRI from November 5, 2009 showed "small areas of white matter foci, non-specific," which "could represent demyelinating disease, ischemic disease or shear injury," and "chronic paranasal sinusitis." (Tr. at 268-69.) A November 17, 2009 electroencephalogram ("EEG") was "unremarkable." (Tr. at 236.) Also on November 17, 2009 Plaintiff underwent cognitive testing for expressive language disorder, headaches, and postconcussion syndrome. (Tr. at 237-38.) A battery of seven tests, to assess "verbal memory, visual memory, motor speed, psychomotor speed, reaction time, focus, ability to sustain attention and ability to adapt to changing rules and tasks," was administered. (*Id.*) The

impression from this visit was that the study was abnormal, findings "would support a suspicion for cognitive impairment," however the etiology could not be determined and clinical correlation would continue. (*Id.*) On July 1, 2010 Plaintiff had another EEG, which was also "unremarkable." (Tr. at 229.) On July 12, 2010 he had another CT because of "difficulty walking" and headache. (Tr. at 297.) There was "no acute process of brain" and "mild chronic ethmoid sinusitis." (*Id.*)

At his November 6, 2009 visit with neurologist Dr. Henry Hagenstein, Plaintiff complained of daily headaches since the accident, which occur "up to twenty times in the course of [a] day." (Tr. at 239-42.) Plaintiff described the headache pain as "very sharp, stabbing head pain, fairly localized to the right temporal region and from there, will radiate to the retro-ocular area." (*Id.*) He also reported issues with word-finding difficulty and problems completing sentences. (*Id.*) At this visit Dr. Hagenstein assessed Plaintiff with headaches, expressive language disorder, and postconcussion syndrome. (*Id.*) His treatment plan was to add Gabapentin, arrange for in depth cognitive, speech, and language testing, arrange for an EEG, and extend sick leave. (*Id.*)

At this visit, upon examination, he was negative for chills, fatigue, and fever; used glasses or contacts; did not have blurred vision or eye pain; was positive for tinnitus and negative for ear pain; was negative for chest pain, orthopnea, palpitations, paroxysmal nocturnal dyspnea and pedal edema; was negative for chronic cough, dyspnea and hemoptysis; was negative for dysphagia, constipation and diarrhea; was negative for dysuria, lesions on external genitalia, hematuria, nocturia, and urinary incontinence; was positive for arthralgias and myalgias and negative for back pain, joint stiffness or limb pain; was negative for pruritis

10

and rash; was negative for easy bruising and excessive bleeding; was negative for temperature intolerances, hirsutism, polydipsia, and polyphagia; was positive for feelings of stress and sleep disturbances; and was negative for anxiety, depression, personality change, difficulty concentrating, or suicidal thoughts. (*Id.*) His "[g]eneral demeanor appear[ed] to be spontaneous," his speech was clear, he was alert, oriented to three spheres, his affect was attenuated, his pupils were round and equal, his direct light reflex was normal bilaterally, consensual constriction was observed, near-point reflex was normal, the optic nerve head appeared to have normal color bilaterally, cup/disk ratio was normal, spontaneous venous pulsations were present, ptosis was not observed, extraocular movements were full, spontaneous nystagmus was absent, smooth pursuit was normal in the vertical and horizontal plane, there was normal sensation to touch, no overt wasting of temporalis or masseter muscle masses, muscles of facial expression were symmetric, hearing was grossly normal with no nystagmus identified, his tongue was midline with normal size and color; and his sternocleidomastoid muscles, neck, sensation, musculoskeletal, cerebellar, and heart were all normal. (*Id.*)

At his December 12, 2009 visit, Plaintiff was "continuing to have symptoms of severe headaches" and mood swings. (Tr. at 234-35.) At his February 23, 2010 visit he reported that his symptoms had not changed significantly although the Depakote seemed to be helpful for his intermittent headaches. (Tr. at 232-33.) At his June 11, 2010 appointment he felt that there had been only minimal improvement "despite undergoing cognitive and speech therapy." His examination results were the same except he was now positive for fatigue and blurred vision and his reflexes had changed to 2/4 responses at the biceps, triceps, brachioradialis, knee jerks,

and Achilles, and the Babinsky was down bilaterally. (*Id.*) Plaintiff also saw Dr. Hagenstein on October 5 and December 15, 2010. (Tr. at 524-25, 527-28.) Vertigo was added to his assessment and his sick leave was extended. (*Id.*)

Dr. Hagenstein extended Plaintiff's sick leave as follows: On November 6, 2009 it was extended to November 30 (Tr. at 241), on November 19 it was extended to December 10 (Tr. at 267), on December 9 it was extended to March 1 (Tr. at 266), on March 23 it was extended to May 1 (Tr. at 259), on April 30, 2010 it was extended until June 11 (Tr. at 242), on June 11 it was extended to October 1 (Tr. at 231), on September 28 it was extended to March 4 (Tr. at 537), and on March 10, 2011 it was extended to June 13, 2011 (Tr. at 532.) There is also a note from Dr. Burnham dated May 25, 2011 which states that Plaintiff "was seen today [and] in my opinion is not to return to work until further notice." (Tr. at 601.)

Dr. Hagelstein referred Plaintiff to Genesys Therapy Services for speech therapy; Plaintiff began treatment on November 24, 2009, was discharged on February 15, 2010, and attended six to nine sessions. (Tr. at 261-64.) Upon admittance, Plaintiff was evaluated with decreased communication and cognitive skills. (*Id.*) The impression was that "[h]e demonstrated moderate deficit with immediate recall," and severe deficits in "recent memory, temporal orientation, spatial orientation, orientation to the environment," and "recall of general information." (*Id.*) He also showed delayed responses during testing, which suggested "severe auditory processing deficits." (*Id.*) Overall he demonstrated "decreased communication and cognitive skills for his current environment."  Upon discharge, the impression was that Plaintiff "continues with decreased communication/cognitive skills." (*Id.*)

12

Dr. Hagelstein also referred Plaintiff to Dr. Barbara Wolf and Dr. Marcia Johnson at McLaren Neurologic Rehabilitation Institute for a neuropsychological evaluation, which took place on February 17-19, 2010. (Tr. at 250-60.) At the time of this visit, Plaintiff was driving but feeling "driving anxiety." (*Id.*) He reported he had never been held back in school, nor had he ever skipped a grade. He denied any "current or past suicidal ideation, plan or intent." (*Id.*) He said that when he was taking the Neurontin after the accident he began to notice "significant mood swings [which had] subsided after discontinuing the medication." (*Id.*) He also reported that since the accident he has felt "more emotional and frustrated in regard to a change in his cognitive abilities and change in overall functional status"; he also reported "having sleep disturbance and racing thoughts since the accident." (*Id.*) At this time his affect was considered to be flat and his mood was considered depressed. (*Id.*) Throughout the evaluation, Plaintiff was generally able to stay on task, but "the speed at which he processed information was extremely slow," and it looked like he was in physical discomfort when completing tasks. (*Id.*) During the tests, Plaintiff "put forth an attempt equal to, and then slightly higher than chance on an effort measure," so the results "should be interpreted with caution in regard to a valid reflection of his current neurobehavioral functioning. (*Id.*)

Plaintiff ranged average "on tasks measuring immediate visual memory, tasks measuring possible neurologic involvement or organicity, . . . and on a 'hold' measure of reading recognition," and he scored "[l]ow average performances" on a "paper and pencil task of arithmetic" and on a "verbal measure of abstraction." (*Id.*) He scored borderline on a confrontation naming task. (*Id.*) A majority of the skills assessments were in the 'impaired range' and often were performed in slow, meticulous manner on timed measures. (*Id.*) Many of

Plaintiff's performances fell below expected levels and, while the results should be interpreted with caution, the results are "likely due to a post-concussive syndrome." (*Id.*) Dr. Wolf opined that Plaintiff should not return to work "at this time or until his symptoms subside." (*Id.*)

Dr. Hagelstein also requested a consultation for an "evaluation of blurred vison and diplopia, and On April 8, 2010, Plaintiff was seen at the MSU Department of Neurology & Opthalmology. (Tr. at 243-49.) The impression from this visit was that the multiple visual and neurological symptoms are all "logically consistent with post-concussive syndrome," there was "[n]o evidence of neuro-ophtalmic sequelae, inclusive of ocular misalignment or traumatic cranial/optic neuropathy," and chronic daily headache versus post-traumatic migraine because of the accident. (*Id.*) Very slow recovery from symptoms was anticipated. (*Id.*) At this visit, Plaintiff's symptoms included general fatigue, vertigo, headaches, blurry vision, tinnitis, nausea, anxiety, and memory loss. (*Id.*) He appeared "clean, well nourished, and fully ambulatory'; his mental status was "awake and alert"; his mood/affect was "[s]lowed cortical processing"; he was oriented to date, location, and person; and he had decreased comprehension. (*Id.*)  His motor exam was normal and his strength was 5/5. (*Id.*)

Dr. Hagenstein referred Plaintiff to McLaren Neurological Rehabilitation Institute for speech and occupational therapy to treat his diagnosed [p]ost-concussion syndrome/expressive language disorder." (Tr. at 185-226.) He was to be treated for "left hand strengthening, bilateral fine motor/coordination skills retraining, additional assessment and remediation of visual perceptual skills. (*Id.*) Plaintiff attended twenty-six sessions from April 12, 2010 to June 30, 2010. (*Id.*) His medical issues at the time were "fatigue, decreased sleep and continuing headache pain of variable intensity." (*Id.*)

Upon admission into occupational and speech therapy, Plaintiff's oral motor status was "within functional limits with no asymmetry noted." (*Id.*) His auditory comprehension showed a "moderate receptive language deficit, as negatively impacted by severely decreased auditory processing skills and verbal retention abilities" and he showed "significantly decreased verbal processing speed" which negatively effected his comprehension of "lengthy directions and would have negative implications for comprehension of lengthy, complex, novel, [and] new information." (*Id.*) His verbal expression showed "moderate level of expressive language deficit, characterized by significant delays in verbal formulation and limited spontaneous verbal output." (*Id.*) He also "demonstrated severely impaired word fluency during [] timed generation tasks demonstrating decreased verbal organizational skills, and reported that he "frequently experiences word retrieval difficulty during conversation and frequently loses his train of thought when speaking." (*Id.*) At this time "no apraxia and dysarthria were observed" and Plaintiff's speech was 100% intelligible. (*Id.*) For cognition, Plaintiff was "oriented to place and time information for month and year," but was unable to independently state the date and all of his responses were "significantly delayed." (*Id.*) His skills "were severely decreased" in memory/recall "for recall of verbal, visual and prospective tasks"; he reported decreased ability to recall daily events in his personal life" and "reported limited strategy use within the home environment to improve his memory skills." (*Id.*) His attention and persistence to tasks was negatively affected by his headache pain and emotional stressors, his organization and sequencing skills were "significantly decreased," and his behavior was appropriate during the evaluation however he "demonstrated limited verbal initiation, short response length and a flat affect." (*Id.*)  He was diagnosed with "moderate to severe cognitive-communicative deficit

affecting the areas of attention, memory, processing speed and verbal organizational skills."
(*Id.*)

Upon discharge, Plaintiff continued "to present with significant cognitive communicative deficit" as a result of his accident. (Tr. at 219.) However, the "negative effects of head pain and posttraumatic stress disorder" interfered with his ability to benefit from the program. (*Id.*) It was also noted that his "current deficits" negatively compromise his ability to return to work as a paramedic at this time." (*Id.*) Treatment was recommended in the future once "psychosocial and pain management issues have demonstrated improvement." (*Id.*) His prognosis for improvement in cognitive communicative status at discharge was poor because of "the negative effects of pain and psychosocial issues." (*Id.*) It was noted that he did "participate well in his treatment program within the limits of his physical abilities" (*Id.*) He was given a home program of compensatory strategies. (*Id.*)

From June 30 to December 20, 2010 Plaintiff was seen by Margaret Moody-Ulmer, a clinical social worker, at Oakland Psychological Clinic for post traumatic stress disorder evaluation and treatment. (Tr. at 312-23, 533.) He consistently went either once or twice a week. (*Id.*) Plaintiff had symptoms of nightmares and flashbacks that he was unable to "shake off." (*Id.*) He would get angry very easily, and relive the accident over and over again. (*Id.*) The goal of the treatment was to address symptoms of post traumatic stress disorder and methods of adjustment. (*Id.*) Therapist intervention included providing interpretations, feedback, and structure, engaging him, exploring feelings, reinforcing gains and insights, reassuring him, allowing ventilation, instilling hope, challenging irrational or negative thinking, and providing suggestions, advice, and instructions. (*Id.*) Dr. Moody advised against Plaintiff's returning to work. (*Id.*)

16

On February 2, May 2, and July 12, 2010, Plaintiff went to Genesys Regional Medical Center complaining of severe headaches. (Tr. at 281-90.) The headaches were worsened by bright light and general movement and relieved by nothing. (*Id.*) On May 2 he was given morphine and Rocephin intravenously; on July 12 the symptoms improved with Compazine, Decadron, and Dilaudid, and Plaintiff was "discharged in good condition." (*Id.*)

On November 3, 2010 Plaintiff was seen by neurologist Dr. Wilbur Boike for an independent medical evaluation. (Tr. at 498-502.) At this visit Plaintiff explained that since the accident he has had a "constant nagging headache," has sometimes experienced vomiting with the headaches, has been hypersensitive to sound, has had blurred vision, is anxious, all his joints hurt, has had violent mood swings, problems with memory, and tinnitus. (*Id.*) Plaintiff went to the exam in sunglasses and when he took them off he "did not appear to be in any discomfort." (*Id.*) His verbal language skills, eyes, facial sensation and expressions, tongue movement, hearing, "extremity strength, coordination, tone and bulk, and reflexes were all normal. (*Id.*) "He made no verbal paraphasic errors" and was "extremely fluent and articulate" when discussing symptoms. (*Id.*) Dr. Boike's impression was that "[a]lthough [Plaintiff] may have experienced a minor traumatic brain injury . . .  in the motor vehicle accident, . . . his clinical course is extremely peculiar. He has widespread complaints and reports no improvement in his situation whatsoever. . . . [Plaintiff's] prior neuropsychological evaluation appears to have been significantly impacted by poor and/or inconsistent effort." (*Id.*) He recommended that Plaintiff have an independent psychiatric evaluation. (*Id.*) He did not believe [Plaintiff] had a significant brain injury or that the "MRI study findings represent[ed] pathology" resulting from the accident. (*Id.*) He noted that the "reported findings [were] reportedly nonspecific in nature." (*Id.*) He also recommended that "all treatment related to

17

'traumatic brain injury' be discontinued," because he suspected that "future neuropsychological testing [would] demonstrate inconsistencies, poor effort, and [would] not validate the diagnosis of a traumatic brain injury." He stated he did not believe Plaintiff needed "medications for his subjective complaints." (*Id.*) He noted that he wanted to postpone commenting on Plaintiff's ability to return to work until he had gone through independent neuropsychological testing, and he stated that "[a]t this point I do not identify any objective evidence of neurological impairment or disability." (*Id.*)

Plaintiff next saw Dr. John Baker, a board certified neuropsychologist, on November 29, 2010. (Tr. at 503-23.) Dr. Baker first noted that, because Plaintiff had neither a loss of consciousness for more than thirty minutes nor posttraumatic amnesia for more than twenty four hours after the accident, while he may have had a very mild concussion, "trauma sufficient to result in brain damage would seem rather unlikely." (*Id.*) At the visit, Plaintiff specifically complained that the following symptoms were caused by the accident: "violent mood swings ranging from once or twice a week to twice a day, short term memory problems, vertigo, joint pain, constant ringing in his ears, and feeling edgy all the time." (*Id.*) He also brought up many other symptoms when Dr. Baker asked for details about the reported symptoms, for example, poor concentration, mild levels of depression, insomnia, and decreased libido. (*Id.*)

Dr. Baker explored the possibility of symptom exaggeration by asking Plaintiff about symptoms that do not typically occur after brain injury–Plaintiff endorsed these pseudo neurological symptoms. (*Id.*) During the examination, Plaintiff's attention and concentration were normal; his affect was full, bright, and appropriate; and his thought production "was expansive, well organized, and logically connected." (*Id.*) His motor and sensory functioning was normal, his attitude toward the examiner was cool, "[h]is task persistence was poor," his

response to difficult tasks was confident, when faced with difficult tasks he expressed anger, and [s]elf-correction was limited and frequent encouragement was needed to assure adequate effort." (*Id.*)

Dr. Baker explored the records from Plaintiff's November 24 to January 27 speech therapy sessions and noted that the profound deficits in problem solving and abstract reasoning, organizational skills, and auditory processing were "rather unusual," because "[o]ne does not typically develop profound impairment as a result of a mild injury." He stated that "Dr. Johnson misinterpreted these results as indicating the need for caution with regard to data [but] [i]n fact, these results are consistent with intentionally poor performance and symptom magnification suggesting that at the very least memory testing would likely be invalid." (*Id.*)

For the effort and symptom validity testing, Dr. Baker stated that Plaintiff appeared to have "performed poorly on purpose in an effort to influence the outcome of the evaluation." (*Id.*) For his psychological status, "[a] structured interview for symptoms of PTSD led to the acknowledgment of nightmares and flashbacks. His description of the nightmares did not seem genuine. The claim of recurrent dreams that are identical is suspicious." (*Id.*)

In his summary and interpretation, Dr. Baker said, given the inconsistencies throughout the tests, the "most reasonable explanation for [Plaintiff's] neuropsychological profile is intentional distortion consistent with malingering." His diagnostic impressions were as follows: somatoform disorder undifferentiated and malingering of closed head injury, personality disorder, multiple somatic complaints with specific diagnosis deferred to physician, and mild psychosocial stressors.  (*Id.*) He said that any treatment should follow from objective findings and not from subjective complaints, which might mislead doctors and result in non-beneficial or unnecessary treatment. (*Id.*) He said that "[f]rom a psychological and neuropsychological

19

perspective, [Plaintiff] appears capable of functioning at pre-accident levels without restrictions or assistance," and that there was no support for a diagnosis of PTSD. (*Id.*)

### 2.      Plaintiff's Function Report and Testimony at Administrative Hearing

Plaintiff indicated in his Function Report that from the time he wakes up until the time he goes to bed, he does the following: goes to the bathroom, brushes his teeth, takes out the dog, eats breakfast, feeds the dog, watches television, cleans up around the house, eats lunch, takes out the dog, and does brain puzzles. (Tr. at 169-76.) He is responsible for the care of his wife as she recovers from shoulder injury and he also takes care of his dog and his cats. (*Id.*) After the accident he is no longer able to drive to unfamiliar locations without assistance, he is unable to go through the day without a headache, and he is unable to follow directions without difficulty. (*Id.*) He can take care of his own hygiene, he needs help remembering to take medication, he can prepare his own meals, has difficulty following recipes, does household chores, sometimes he needs help with chores if his head hurts, goes outside daily, goes grocery shopping a few times a week, and is able to pay bills but his wife takes care of banking because he sometimes makes errors on deposits. (*Id.*) His hobbies include archery, fishing, hunting, making custom fishing poles, and watching television–since his injury it has become more difficult for him to build fishing poles. (*Id.*)  He spends time with other people playing cards and computer games. (*Id.*) He regularly goes to therapy two to four times a week. (*Id.*) Sometimes he gets angry for no reason which can make getting along with others difficult. (*Id.*) Since his accident he has found he does not care to be around people as much because of the lights, noise, and vertigo he gets from tall buildings. (*Id.*)

At the administrative hearing, Plaintiff testified that he only drives to close-by, familiar locations by himself because otherwise he gets lost. (Tr. at 61.) He has been getting about $20

per day doing replacement services, such as laundry, house cleaning, and yard work for his wife after her accident. (Tr. at 62.) This is the only work that he has done since October 2, 2009. (*Id.*) He stated he gets severe headaches that require lying "in a dark room for several hours" about six to eight times a month. (Tr. at 65.)

### 3.   Vocational Expert Testimony at Administrative Hearing

At the administrative hearing, the ALJ asked Timothy Shaner, the vocational expert ("VE"), to consider a hypothetical individual with the same age, education, and work experience as Plaintiff who:

> is able to perform work at the light exertional level, that consists of no more than simple, routine, repetitive tasks with one or two step instructions. That does not impose . . . [a] requirement to produce a specified number of units at work in a specified period of time. And that does not require interaction with the public to perform any of the job duties.

(Tr. at 63.) The VE responded that such a person could perform the any of the following unskilled entry-level occupations available in Michigan: 367,000 housekeeping jobs, 211,000 stock clerk jobs, or 83,000 laundry worker jobs. (Tr. at 72-73.) The VE said that employers normally require strict attendance in these jobs and typically missing one day per month for an unexcused reason would lead to termination. (*Id.*) The VE also noted that Plaintiff's past work was as a paramedic and the exertional level was very heavy. (Tr. at 72.)

The ALJ determined that the VE's testimony was "consistent with the information contained in the Dictionary of Occupational Titles." (Tr. at 49.)

### F.   Analysis and Conclusions

### 1.   Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the residual functional capacity to perform a limited range of unskilled light work. (Tr. at 44.)

21

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.     Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 8 at 1.) As indicated above, if the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g);  *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff argues that the ALJ's hypothetical did not accurately portray Plaintiff's impairment because he did not properly assess Plaintiff's credibility or properly evaluate the "medical records of evidence." (Doc. 8 at 6.)

### a.     Plaintiff's Credibility and the RFC

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683.  The social security regulations establish a two-step process for evaluating subjective symptoms,

including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Finally, the ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(I)     [D]aily activities;

(ii)     The location, duration, frequency, and intensity of . . . pain;

          (iii)     Precipitating and aggravating factors;

(iv)     The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)     Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. The claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The RFC "is the most [a claimant] can still do despite [the] limitations," and is determined using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The hypothetical is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 2009).

b.    **Analysis**

Plaintiff attacks the ALJ's findings for distorting his limitations in the RFC. (Doc. 8 at 6.) The precise targets of this criticism, however, are difficult to discern. Plaintiff opens with a protracted description of the rules surrounding the credibility analysis and also the requirement that the ALJ's hypothetical accurately describe the claimant. (Doc. 8 at 6-9.) He then shifts to recount his testimony and medical records in an attempt to prove the ALJ's findings diverged from the evidence. (*Id.* at 10-11.) But quoting his own testimony of subjective pain and impairments and the medical impressions of physicians merely proves that his symptoms arose from diagnosable maladies. (*Id.*) Claimants must do more: they must show that the medical condition impairs them from participating in substantial gainful activity. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition.").

The hypothetical was based on the RFC and is valid because it includes all the credible limitations. *See Casey*, 987 F.2d at 1235. The ALJ first confirmed that objective medical evidence of the underlying condition existed. (Tr. at 45.) In making this determination, he

24

considered the November 2009 MRI, which showed "a few bilateral frontal small foci within the white matter that was considered non-specific but could represent a demyelinating disease, ischemic disease, or sheer injury." (Tr. at 45-46.) He also noted that Dr. Hagenstein found the results of the cognitive tests "abnormal and suspicious for cognitive impairment." (Tr. at 46.)

With this objective evidence in hand, the ALJ moved on to the second step of the two-step process for evaluating subjective symptoms of pain, whether the condition could reasonably be expected to produce the alleged pain or whether the other objective evidence verified the severity of the pain. *See* C.F.R. § 404.1529; SSR96-7p, 1996 WL 374186, at *2. In answering this question, the ALJ first determined that, because the "intensity, persistence, or functionally limiting effects" of Plaintiff's pain were "not substantiated by objective medical evidence," he must undertake a separate assessment of the credibility of the Plaintiff's statements. (Tr. at 44.)

The ALJ found "[a]fter careful consideration," that while Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,] . . . statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the . . . residual functional capacity assessment." (Tr. at 45.) The ALJ considered the normal CT scans, the unremarkable EEG, and the fact that "claimant's strength, reflexes, range of motion, coordination, and sensation were all normal."  (Tr. at 46.) He gave significant weight to board certified neuropsychologist Dr. Baker's opinion that "claimant was capable of functioning without restrictions or assistance," and to Dr. Wolf and Johnson's opinion that Plaintiff "was moderately limited in social and occupational functioning" because both of these opinions were given by acceptable medical sources and they are both consistent with other evidence. (Tr. at 47.) He gave little weight to

social worker Dr. Moody-Ulmer's opinion that Plaintiff "should not return to work and required continued psychotherapy because the opinion was not from an acceptable source and because opinions about ability to return to work are reserved to the Commissioner. (*Id.*) The ALJ also considered the evidence of poor task persistence, symptom magnification, and malingering–this evidence came from the acceptable sources of Dr. Boike and Dr. Baker, and were consistent and "well-supported." (Tr. at 45-47)

The ALJ explained that "[b]ecause a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence," he must consider the factors laid out in 20 CFR 416.929(c) when assessing Plaintiff's credibility. (Tr. at 44-45.) He then noted that Plaintiff "alleges that he suffers from post-concussion syndrome, headaches, and somatoform disorder," and that as a result experiences pain, cannot concentrate, suffers from mental and physical fatigue, confusion, short-term memory loss, has difficulty sleeping, needs reminders, has difficulty completing tasks, and cannot work. (Tr. at 46.) He also notes that "[d]espite these allegations, the claimant attends to his personal hygiene, does household chores," cares for pets, goes hunting and fishing, and plays computer games. (*Id.*) The ALJ notes that "[h]ere, the claimant has described daily activities that are inconsistent with the claimant's allegations of disabling symptoms and limitations, which weakens his credibility." (*Id.*) He concludes as follows:

> The claimant's allegations are not fully credible. The claimant suffered deficiencies from a concussion from a motor vehicle accident on the alleged onset date, which include headaches. The claimant gave testimony about loss of concentration and memory, and poor sleep. These are reasonably to be expected from his medically determinable impairments, but [are] accommodated by the residual functional capacity.

Because the ALJ looked to Plaintiff's testimony at the administrative hearing and to the administrative record and considered all of the factors set forth in 20 C.F.R. § 404.1529(c), his credibility assessment, like his disability assessment, was supported by substantial evidence.

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   REVIEW

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  August 1, 2014                              /S PATRICIA T. MORRIS
                                                   Patricia T. Morris
                                                   United States Magistrate Judge

**<u>CERTIFICATION</u>**

I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system which delivers a copy to all counsel of record.

Date:  August 1, 2014                    By____s/Jean L. Broucek_____
                                         Case Manager to Magistrate Judge Morris